UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

DATABIT INC.,                                                Case No. 08cv1229
                                                             (MGC)(AJP)
                                    Plaintiff,

        - against -
                                                             **ATTORNEY
                                                             AFFIRMATION**

MORDECHAI HANINOVICH, OSI KAMINER,
JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3,

                                    Defendants.

-----------------------------------------------------------------------x

        Paul Savad, an attorney duly admitted to practice in this Court and in the

courts of the State of New York, affirms the following pursuant to CPLR 2106:

        1.    I am the attorney for plaintiff, DataBit, Inc. (DataBit), and make this

affirmation based on a review of the documents contained in the plaintiff's files,

conversations with personnel of DataBit, and the affidavits submitted herewith.  I

make this affirmation in support of the plaintiff's application for a TRO and motion

for a preliminary injunction, pursuant to Rue 65 Fed. R. Civ. P.


        **Need for TRO and Preliminary Injunction**

        2.    As more fully detailed in the complaint and in the affidavits annexed, the

defendants have carefully positioned themselves to misappropriate DataBit's

confidential proprietary trade secret information and use it to take DataBit's

largest account as their own, and appear to have already misused some of this

misappropriated information for their own benefit, against the interests of DataBit.

Use of the information will provide the defendants with a competitive advantage

that no other competitor could have, without expending substantial time, effort and expense, in the highly competitive market of computer sales and services.

3.    The plaintiff is not seeking to protect a customer list, but rather, to protect the details concerning prices, costs, profit margin, contacts, and the client's specific needs, all of which would allow the defendants to enjoy an unfair competitive advantage at plaintiff's expense.

4.    As of today, there is still an opportunity to maintain the *status quo* for a brief period by TRO, allowing the defendants to be promptly be heard on whether a preliminary injunction should be issued.  This protects the *status quo* so that the plaintiff is not forced to attempt to turn back the clock after the damage is done.

5.    The TRO has been worded to limit the enjoinder to the defendants' servicing of only one specific client with only those services historically provided to that client by DataBit.  It does not seek to prevent the defendants from providing different services to that one client, or from providing services to other clients of the plaintiff.


**Procedural Background**

6.    This case was originally commenced in the Supreme Court of the State of New York, County of New York, on February 5, 2008, simultaneously with the submission of an Order to Show Cause seeking the same relief requested herein.  Although Defendant Haninovich's then-attorney, Jennifer Rubin of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., agreed to appear for the argument

of the TRO the next day, February 6, 2008, at 2:30 p.m., and my office agreed to email her a courtesy copy of the papers (not required in New York State court practice), she changed her mind, refused to commit to a fixed time, and advised that she might not represent Mr. Haninovich, since other defendants were named (**Exhibit A**, annexed hereto).  Based upon the appearance of a new law firm representing Mr. Haninovich, we believe that Ms. Rubin was hired by one of the John Doe defendants, prepared to represent Haninovich, until their interests diverged.

7.    The case was removed to this Court on February 6, 2008, making it impracticable for the plaintiff to be heard on a TRO application, which had to be revised for federal court, until February 14, 2008.  Meanwhile, the defendants continue to improperly compete with DataBit in providing computer services to DataBit's largest client, Montefiore Medical Center.

### History of Haninovich with DataBit

8.    The affidavit of DataBit's president, Shlomie Morgenstern, and the Verified Complaint, annexed to Morgenstern's affidavit as **Exhibit A**, detail the history of the company and its relationship with the defendants, supported by exhibits and additional affidavits of the company's CFO, Neil Fogel, and account respresentatives Rami Zilberschmidt and Gilbert Gehler.

9.    Briefly, DataBit provides consultation, sales and services of computer equipment to its clients in the continental US and in Israel.  It is headquartered in New Jersey and has offices in New York, Los Angeles and Israel.  It has 20

employees, almost all working for the company for many years, with very little turn-over. In 2007, Montefiore Medical Center was its largest client, generating eight million dollars of revenue and accounting for 60% of the company's revenue for the year.

10. Mordechai (Modi) Haninovich ("Haninovich") has worked for DataBit since 1992 as an account representative. There is no written contract. Instead, there is a long history of the actions and expectations of the parties, including Haninovich's responsibility to sell DataBit's computer services (consultation, sales, installation, and servicing of the client's computer needs), and to service the client accounts. In return, DataBit advances the capital needed, pays all expenses, pays commissions, pays for a car, cell phone and expense account, and provides ordering and shipping services, administrative personnel and technical personnel. Modi has always been carried on the company books as a 1099 contractor, possibly due to his status as an Israeli citizen without a green card. All other personnel of the company are employees, including other account representatives with the same responsibilities and compensation as Haninovich.

11. Modi brought the Montefiore account to DataBit in late 1994 or early 1995 while working for and while financed by DataBit, and has been managing the account ever since. There is no written contract with Montefiore, but as with Modi, there is a 13-year history of their obligations to each other and the good will built by DataBit.

12. Osi Kaminer ("Kaminer") is DataBit's employee assigned as full-time assistant to Haninovich for the Montefiore account.

13.   To service the Montefiore account without DataBit, Modi would need to associate with another company or individual who supplies all of the capital and support services now supplied by DataBit.  John Doe numbers 1, 2 and 3 are intended to be those unknown entities or individuals with whom Modi and/or Osi may be affiliated for the purpose of servicing the Montefiore account.

**Misappropriation of Trade Secrets**

14.   Modi abruptly resigned on January 25, 2008, without notice, effective immediately (**Exhibit B** of Morgenstern affidavit).

15.   Kaminer resigned on February 1, 2008.

16.   While servicing Montefiore's account for DataBit, both Modi and Osi acquired confidential proprietary trade secret information, including information on pricing, costs and profit margin, and knowledge of Montefiore's precise needs for over 10,000 computer stations, including dates for licensing renewals, status of every computer, as well as developing personal relationships with all of the contacts at Montefiore required to timely maintain the system without interruption. All of this information has been developed at DataBit's expense.

17.   It appears that while still working for DataBit, Modi, with the help of Osi, was taking steps to transfer the servicing of Montefiore's account to himself and others while still working for DataBit, in violation of his fiduciary duties to DataBit (see Memorandum of Law, submitted herewith, concerning the fiduciary duty of independent contractors and employees), and in relieance on proprietary trade secret information of DataBit that Haninovich a competitive advantage that no

other competitor to DataBit would have.  He appears to have retained proprietary confidential information from his computer supplied by DataBit, and did not return the computer for a week after he resigned, only after this lawfirm demanded its return.

18.   Modi's and Osi's knowledge of DataBit's profit margin, a closely guarded secret at the company, known only to key personnel on a need-to-know basis for servicing the account, provides them with an unfair competitive advantage (see Memorandum of Law).  Montefiore does not know the plaintiff's suppliers, costs or profit margin.  Furthermore, if Montefiore were to independently put all of its computer needs out to bid, it would not reveal what it is paying DataBit, as that would not invite the lowest possible bids.

19.   Haninovich has already improperly capitalized on DataBit's proprietary information by using DataBit's suppliers to provide services to Montefiore through his friend's company, Advanced Solutions & Supply LLC, instead of through DataBit.  Montefiore has advised DataBit's president, Shlomie Morgenstern, that Modi and Advanced Solutions & Supply LLC are already supplying computer services to Montefiore and are actively competing directly against DataBit.

20.    Without an injunction, the defendant will be able to capitalize on DataBit's proprietary trade secrets to gain a competitive advantage that no other potential competitor would have.  This is evidenced by DataBit's ability to maintain Montefiore's account for 13 years with no apparent competition in a highly competitive field, without any written contract, based on their history of dealings, understandings and good will.

**No Prejudice to Montefiore by Injunction**

21.   Montefiore's operations will not be prejudiced by an injunction.  DataBit has already assigned staff to handle the account and has placed an experienced employee on site four days a week to make sure there is no interruption in services (see Morgenstein Affidavit ¶¶ 46, 54).  If anything, DataBit's continued services will ensure the orderly operation of the hospital's computer system, rather than allowing a disruption from new providers.

**Irreparable Damages**

22.    Misappropriation of trade secrets alone constitutes irreparable damage (see Memorandum of Law).

23.   Additionally, damages from such a loss are incalculable, despite the ability to calculate the historical profits from Montefiore.  It will be impossible to know how many potential customers DataBit lost by not being able to use the current servicing of Montefiore as a marketing tool for new customers.  Similarly, it is impossible to know how many years of continued business with Montefiore DataBit would have enjoyed, but for the defendants' misappropriation of trade secret information.  Further, the company would no longer be viable, and would have to cut back staff and facilities by 60%, commensurate with the business it will lose from Montefiore.

24.   This requires temporary and preliminary injunctive relief, as discussed in the Memorandum of Law.

WHEREFORE, plaintiff requests that the Court sign the Order to Show Cause with a TRO, and grant the motion for a preliminary injunction, together with such further relief as the Court deems just and proper.

Dated:    Nanuet, New York
          February 12, 2008

_____
PAUL SAVAD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DATABIT INC.,                                          Case No. 08cv1229
                                                       (MGC)(AJP)
                                    Plaintiff,

        - against -                                    **AFFIDAVIT**

MORDECHAI HANINOVICH, OSI KAMINER,
JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3,

                                    Defendants.
-------------------------------------------------------------------x
STATE OF NEW YORK    )
                     )
COUNTY OF ROCKLAND )

        Shlomie Morgenstern affirms the following under penalty of perjury:

1.  I am President and sole shareholder of plaintiff DataBit.

2.      I make this affidavit based upon my personal knowledge of the
facts.  I incorporate by reference the Verified Complaint, annexed hereto as
**Exhibit A**, which is submitted as an affidavit, pursuant to CPLR 105(u)[1].


**Need For Temporary And Preliminary Injunctive Relief**

3.      I request that the Court temporarily and preliminarily enjoin
defendants, Mordechai Haninovich ("Modi"), Osi Kaminer ("Osi") and any
individual or entity participating with either or both of them, from providing any
computer sales or services to Montefiore Medical Center ("Montefiore"), which
computer services have previously been provided by DataBit as follows:

---

[1]  There is a typographical error in the complaint, which refers to over 5,000 computers supplied and serviced by DataBit at Montefiore Medical Center.  The correct number is approximately 10,000 computers.

consulting, sales and technical support for a system of approximately 10,000

computer stations, with desktops, laptops, monitors, servers and printers.

4.    Modi, who was an account representative for DataBit for

approximately 15 years, abruptly resigned on January 25, 2008, without notice,

effective immediately.  A copy of his resignation letter is annexed as **Exhibit "B"**.

He was the sole account representative responsible for servicing DataBit's

account with Montefiore, which is DatatBit's largest account, generating eight

million dollars worth of business in 2007, constituting approximately 60% of

DataBit's revenues last year.  For thirteen years, DataBit has supplied and

serviced the lion's share of Montefiore's computer needs, except for specialized

medical and technical systems.

5.    Osi was employed by DataBit as Modi's full-time assistant servicing

the Montefiore account.  She resigned on February 1, 2008.

6.    While servicing the account for DataBit, Modi and Osi acquired

confidential proprietary trade secret information, including pricing, costs, profit

margin, knowledge of Montefiore's precise needs for approximately 10,000

computer stations, the age and condition of each computer, the expiration dates

of licenses, and the like.  They each developed the necessary personal

relationships with all contacts at Montefiore required to timely maintain the

system without interruption, including the purchasers for the many departments

within the hospital, each with their own budgets.

7.    Since Modi's resignation, we have learned that Modi was taking

steps to transfer the servicing of Montefiore's account to himself and others,

including Advanced Solutions & Supply LLC, while still working for DataBit, in violation of his fiduciary duties to DataBit, and in reliance on DataBit's proprietary information, as more fully discussed below. We believe he retained proprietary confidential information from his computer supplied by DataBit. He did not return the computer until February 1, 2008, after DataBit's attorneys demanded its return, did not return the base and power cord needed for us to operate the computer until February 11, 2008, and cleaned out all of DataBit's correspondences, orders, and other documents that should have been on the computer.

8.      Without an injunction, the defendants will be able to capitalize on DataBit's proprietary trade secrets to gain a competitive advantage that no other potential competitor would have, as evidenced by DataBit's ability to maintain Montefiore's account for 13 years with no apparent competition in a highly competitive field, without any written contract, based solely on our history of dealings, understandings and good will.

9.      Damages from such a loss are incalculable, despite the ability to calculate the historical profits from Montefiore. It will be impossible to know how many potential customers DataBit lost by being unable to use the servicing of Montefiore as a marketing tool for new customers. Similarly, it is impossible to know how many years of continued business with Montefiore would have been enjoyed by DataBit without the defendants' misappropriation of trade secret information. Further, the company would no longer be viable, and would have to

cut back staff and facilities by 60%, commensurate with the business it will lose from Montefiore.

### Company Background

10.    DataBit is a value added reseller ("VAR") of computer hardware and software, offering a wide range of computer services for mid-sized and large companies since it was formed in 1990.   DataBit's services include consultation, sales, implementation, installation and servicing of various types of software and hardware and technical support.   A description of the services provided from DataBit's web site is annexed as **Exhibit C.**

11.    DataBit was formed in 1990 and was purchased by Data Systems & Software, Inc. ("DSS") in 1992.  My father was founder, CEO and president of DSS, which was a publicly traded company.  I purchased   DataBit in 2006.  I have been with DataBit since 1996, and have been its president since approximately 1998.

12.    DataBit currently has approximately twenty employees with offices in New York, New Jersey and California.

13.    The account representatives at DataBit receive a compensation package, which includes a base amount, commissions, a car allowance, a cell phone, medical benefits, and an expense account.  Some benefits vary based on experience and performance.

### Modi's Hiring and Status as Independent Contractor

14.     Modi was hired as an account representative in 1992, and was given existing accounts to service while he worked to develop new accounts for DataBit (see affidavits of Zilberschmidt and Gehler).  He has worked without any written contract since then, similar to all other employees of DataBit.  Modi's responsibilities and compensation were identical to every other account representative who has ever worked for DataBit since its inception.  Modi came to the company without any clients of his own.  DataBit has always paid all of his business expenses, plus base compensation, commission and benefits, like every other account representative.

15.    For reasons unknown to anyone still working for DataBit, Modi was always carried on the books as a 1099 independent contractor, although all other account representatives are carried as employees, including those who helped found the company, such as Rami Zilberschmidt, and those with substantial longevity with the company, such as Gilbert Gehler, who was hired by DataBit a year after Modi was hired.

16.     I can only assume that Modi was carried on the books as a 1099 contractor solely due to his immigration status as an Israeli citizen without a green card.  DataBit paid for many years for an attorney to deal with Modi's immigration status as an alien working in the US.

17.     My attorneys advise me that it makes no difference whether Modi was an independent contractor, or an employee, because either way, he owed DataBit a fiduciary duty with respect to the services he was hired to provide.

**The Montefiore Medical Center Account**

18.     Although I was not working for the company when Modi began, I have been told by Rami Zilberschmidt, one of the company's founders, that Modi brought no accounts with him to DataBit when he first began working there. DataBit gave him some of their existing accounts to service and he was expected to develop new accounts for DataBit.  It was not until approximately one year later, in or around the end of 1994, or the beginning of 1995, that Montefiore became a client of DataBit, through Modi's sales efforts, all financed by DataBit (Zilberschmidt affidavit).

19.     Gilbert Gehler, an account representative who came to the company one year after Modi began, told me that Modi developed the Montefiore account when his neighbor, a doctor at Montefiore, agreed to introduce him to Montefiore.

20.     The Montefiore account grew slowly and developed over a decade. For the years 2003, 2004, and 2005, Montefiore accounted for 28%, 40% and 33% respectively of DataBit's business, as reported to the SEC in DataBit's parent company's 2005 Form 10K (**Exhibit D**).  In 2007 the Montefiore account had grown to 8 million dollars and constituted 60% of DataBit's business. Montefiore currently has a system of approximately 10,000 computers that are serviced by DataBit, and DataBit has an office on-site to provide whatever services and sales are needed.

21.    I have been advised by Michael Levy, Manager of Acquisitions for Montefiore Medical Center, that for many years Montefiore has dealt exclusively with DataBit for the services it provides, which is the lion's share of Montefiore's computer needs.  There is a small percentage of Montefiore's computer needs serviced by other providers, including specialized medical equipment systems.

22.    The defendant was the sole representative for DataBit responsible for servicing the account at Montefiore Hospital, with the full-time assistance of Osi, an employee of DataBit.  Montefiore has described Modi's responsibilities to include the following:

a.  Working on site at Montefiore Hospital several days per week to review all computer issues, the status of various projects and requests for quotes;

b.  Meeting with Montefiore Hospital technical personnel in its Yonkers location to review projects and specifications;

c.  Arranging for equipment repairs when necessary;

d.  Ensuring that Montefiore's requests for quotes on equipment are provided within one to two days; and

e.  Researching various problems and determining a course of action to follow to rectify any problems that arise.

23.    Modi was responsible for determining the price at which equipment would be sold and serviced for Montefiore by DataBit.  All paperwork was processed by Osi.

24.    Over the course of more than a decade, Modi developed relationships with many key individuals within Montefiore's many departments, became intimately familiar with the hospital's computer equipment and servicing needs, including all licensing and user information, developed pricing for

7

equipment and services on behalf of DataBit, and carefully guarded the trade secret of DataBit's profit margin. Modi's ability to develop such a relationship with Montefiore was financed completely by DataBit, including providing him with a full time assistant for the Montefiore account, Osi, who also knows this information and deals regularly with Montefiore's contact personnel.

25.    Although there is no written contract with Montefiore, it expects and has demanded, based on our many years of providing these services, that DataBit continue to maintain its computer system, despite Modi's departure, so that there is no interruption of Montefiore's operations. On January 29, 2008, four days after Modi abruptly resigned, Michael Levy, Manager of Acquisitions at Montefiore, sent an email to Osi, demanding to know "how DataBit is planning on servicing our account" now that Modi has left the employ of DataBit (**Exhibit E**).

26.    Since then, DataBit has met all of Montefiore's needs and expectations, despite the handicap of Modi's abrupt departure without notice. DataBit has assigned additional personnel to service the account, and has reduced its charges to Montefiore, to compensate for Modi's abrupt departure without notice to Montefiore.

### Recent Events

27.    Few things have changed since I purchased the company in 2006. I continue to run the company as I have for many years. However, I instituted a new policy to have new employees (only two to date) sign a non-compete agreement effective for a period of 6 months after termination of employment

(**Exhibit F**).  The employee handbook used for many years has a section on Non-Disclosure listing as confidential business information and trade secrets many items, such as customer lists, financial information and pending projects and proposals (**Exhibit G**, which is the 2006 version, and is essentially the same as previous years, except that Jewish Holidays were added to the list of holidays).

28.     On December 27, 2007, after the company's accountants questioned Modi's status as a 1099 contractor, Neil Fogel, DataBit's Chief Financial Officer, advised Modi that due to stricter IRS requirements, Modi could no longer be considered as a 1099 contractor, and that he would be treated as a regular employee with all of its benefits and responsibilities (**Exhibit H**).

29.     Modi responded by asking what the new regulations are, and reminding Mr. Fogel that "it was not my option" to be a 1099 contractor and that he was "forced to do it." (*See* **Exhibit H**).

30.     In addition to the usual employee forms, DataBit asked Modi to sign the new non-compete agreement.  He did not sign any of the employee forms (**Exhibit I**).

31.     Modi's compensation in 2006 totaled $314,169.00.  It was higher in 2007, (the full figures are not yet available), based on Montefiore's purchase of eight million dollars of services from DataBit.

32.     In or about the summer of 2007, Modi requested that DataBit give him 50% of its profits on Montefiore's services.  I offer him one-third.

33.    It now appears that for a period of time prior to resigning, Haninovich was making arrangements to service the Montefiore account with another entity and/or individuals who provide services similar to those provided by DataBit, obtained the legal services of Jennifer Rubin of Mintz, Levin, Cohn, Ferris Glovsky and Popeo, P.C., to further these arrangements, and intentionally delayed all new orders, with the assistance of Osi.

34.    We recently discovered that Modi began competing directly with DataBit while still working for DataBit.  We had located a company, Smart Source, to provide extra technicians to service Montefiore, and negotiated an hourly rate with Smart Source.  We billed Montefiore for the services at a profit. Today I confirmed with Smart Source that sometime prior to January 18, 2008, while Modi was still working for DataBit, he called Smart Source and asked for five specific technicians, some of whom worked for us through Smart Source. Smart Source supplied them beginning January 18, and was asked to bill Advanced Solutions & Supply LLC, not DataBit, for these people for work at Montefiore.  A purchaser at Montefiore told me that Advanced Solutions is Modi's new company, which Montefiore will now allow to bid against DataBit for projects. DataBit's CFO, Neil Fogel, has independently confirmed that Advanced Solutions is Modi's new company (see Fogel Affidavit).

35.    I was out of the country when Modi resigned.  Since neither DataBit nor Montefiore was given prior notice of his resignation, and since I was out of the country, Micheal Levy, Montefiore's Manager of Acquisitions, emailed Osi, Modi's assistant, on January 28, 2008, at 10:04 a.m., requesting that the email

be forwarded to me immediately, and requiring an answer that same day to Montefiore's request for DataBit's plan to maintain uninterrupted services to Montefiore, despite Modi's resignation (**Exhibit E**).

36.    Neither Haninovich nor Osi forwarded Mr. Levy's email to Shlomie Morgenstern for 24 hours, knowing that by then I would have boarded a 12-hour flight from Israel to New York, and would not receive the email to respond to Mr. Levy as he requested (**Exhibit E**).

37.    Shortly before the email was forwarded, and long before I received it, Mr. Levy sent another email the next day on January 29, 2008, complaining that its account had not been properly serviced lately, with weeks of delays in receiving quotes (apparently deliberately delayed by Modi), and angrily complaining that he had received no answer from me, and stating that Montefiore's account was "not important enough for either reasonable service or common business courtesy in communicating significant changes" (**Exhibit J**).

38.    Osi resigned her position with DataBit on February 1, 2008, I believe to join Modi's efforts to service the Montefiore account after helping to sabotage DataBit's relationship with Montefiore.

39.    I arrived back in the United States the night of January 29, 2008, and immediately met the next morning with lawyers to commence legal action to prevent Modi and Osi from misappropriating DataBit's trade secrets and proprietary information, taking unfair advantage of the knowledge they had acquired at DataBit's expense while working for DataBit, which knowledge is essential to service the Montefiore account without interruption, and which

knowledge could not be timely obtained by a competitor without fraud or misappropriation of DataBit's proprietary trade secrets.

### Trade Secrets, Proprietary and Confidential Information

40.    As Modi developed DataBit's relationship with Montefiore, he and Osi obtained confidential proprietary trade secrets that no competitor would have.

41.    Most importantly, Modi and Osi know DataBit's profit margin, which no other competitor knows.  Knowledge of this would allow any competitor to underbid DataBit.  This information will be provided to the Court *in camera*, if requested.

42.    Additionally, Modi and Osi have acquired, as agents for DataBit and at DataBit's expense, up-to-date knowledge of all of Montefiore's computer needs for a 10,000-computer system, licensing information with expiration dates, relationships with key personnel needed to facilitate DataBit's servicing of the computer system without interruption, suppliers, special pricing deals, details of all quotes for pending projects, and other information.

43.    No one other than Modi and DataBit could walk into Montefiore today and service that account without interruption.  It would take at least six months for any competitor to be able to do what Modi does, without access to DataBit's knowledge.  Only Modi and DataBit can seamlessly transition to another certified reseller of the services now provided to Montefiore by DataBit. Modi's personal relationships with the staff at Monefiore, developed at DataBit's expense, give him an edge over DataBit.

44.    The prices paid by Montefiore, as well as DataBit's actual costs and profit margin, are in the exclusive control of only those key personnel of DataBit on a need-to-know basis in connection with Montefiore's account.

45.    No other employees have access to the pricing information, nor do they know what DataBit's profit margin is for the Montefiore account.    Not even Montefiore knows what DataBit's profit margin is, nor does it know our suppliers and costs. It knows only what it pays us.

46.    If this information were known by competitors, they would have an advantage that they could not acquire on their own.  If this information were easily acquired in this highly competitive industry, we would not have held on to Montefiore's account for over a decade, virtually without any competition.  It would be easy for competitors to underbid DataBit if this information were revealed.  DataBit's unchallenged longevity in servicing Montefiore is evidence in itself that no competitor has yet acquired this information.

47.    Furthermore, since Modi is the only person with well-developed relationships with the Montefiore personnel necessary to efficiently service the account, he is in a position to improperly use DataBit's proprietary trade secrets for his own benefit and against the interests of DataBit, to gain an unfair competitive advantage against DataBit and all other competitors in the servicing of Montefiore's account.

48.    There is no question that if the defendants are not enjoined from utilizing this confidential and proprietary information, DataBit is at great risk of them bringing the information to competitors and personally profiting from it at

DataBit's expense.  On the other hand, Montefiore will not be damaged by an injunction, as DataBit has already assigned staff to keep Montefiore's computers running smoothly. If anything, an injunction will benefit the orderly operation of the hospital, in that DataBit continues to provide the necessary services, without the disruption that accompanies an abrupt transfer to a new provider.

### Breach of Fiduciary Duty and Duty of Loyalty

49.     Upon information and belief, Modi has been positioning himself to take this account from DataBit and has been exploring other reseller to supply the capital, facilities and technical support that DataBit has provided for the past decade.  Modi could not do this himself, as he does not have the resources to provide the services without a certified reseller of these services, and he is not himself certified to do this.

50.     Upon information and belief, while working as DataBit's agent, Modi has simultaneously been making arrangements, with Osi's assisance, to take the Montefiore account from DataBit.  They have apparently delayed processing new orders for the benefit of themselves and contrary to DataBit's interests.  Modi did not promptly return his computer, and when it was returned, it was cleaned of all of DataBit's records that should have been on the computer, including company correspondence, ordering information, etc.

51.     As explained above and in the affidavit of Neil Fogel, Modi diverted to himself DataBit's business with Smart Source and Montefiore, so that Modi would receive some or all of what should have been DataBit's profits.

**Damages**

52.     The damages that would result from the use by Modi and the defendants of the confidential and proprietary information that he and Osi possess, would be incalculable.

53.     DataBit has expended millions of dollars in developing and maintaining its relationship with Montefiore, including providing all necessary capital, paying all expenses, providing a compensation package to Modi, paying a full-time administrative assistant, paying one full-time technical consultant and other technical consultants as needed to service the Montefiore account, and providing ordering and shipping services.

54.     If Modi or Osi misappropriate DataBit's proprietary trade secrets, DataBit will no longer be a viable company, and will be forced to cut its staff and facilities by approximately 60%.  It will no longer be able to use its servicing of Montefiore's computer needs as a sales tool to attract new customers with its capabilities.  There is no way to know how many potential customers may be lost, nor how long DataBit would have continued to enjoy its profitable relationship with Montefiore, absent the wrongdoing of the defendants.

55.     Without a temporary restraining order, DataBit is at great risk that Modi will bring its trade secrets, confidential and proprietary information to its competitors and profit from it, all at DataBit's expense.

**CONCLUSION**

56.    I request that the Court issue a temporary restraining order enjoining the defendants, defendants, Mordechai Haninovich ("Modi"), Osi Kaminer ("Osi") and any individual or entity participating with either or both of them, including Advanced Solutions & Supply LLC, from providing any computer sales or services to Montefiore Medical Center ("Montefiore"), which computer services have previously been provided by DataBit as follows: consulting, sales and technical support for a system of approximately 10,000 computer stations, with desktops, laptops, monitors, servers and printers.

57.    Montefiore will not be hurt by an injunction, as DataBit has assigned staff to handle Montefiore's needs, including an experienced employee who will be on site four days a week to ensure no disruption of service.  If anything, Montefiore will benefit from the orderly operation of the hospital without the disruption of a new provider.

58.    I affirm this affidavit pursuant to my religious beliefs.

SHLOMIE MORGENSTERN

Affirmed before me on this _12TH_
day of February, 2008

Notary Public

SUSAN COOPER
Notary Public, State of New York
No. 4989636
Qualified in Rockland County
Commission Expires 12/16/0

# EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
DATABIT INC.,

                                        Plaintiff,          Index No. 08- 600338

        - against -
                                                            SUMMONS

MORDECHAI HANINOVICH, OSI KAMINER,
JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3,

                                        Defendants.

-------------------------------------------------------------------x

TO THE ABOVE NAMED DEFENDANTS:

        **YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action and
to serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, on the Plaintiff's attorney(s) within 20 days after the service
of this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New York);
and in case of your failure to appear or answer, judgment will be taken against you by
default for the relief demanded in the complaint.

Dated:  Nanuet, New York
        February 1, 2008

                                        PAUL SAVAD, ESQ.
                                        Paul Savad and Associates
                                        Attorneys for the Plaintiff
                                        55 Old Turnpike Road, Suite 209
                                        Nanuet, New York 10954
                                        (845) 624-3820

Defendants' Addresses:

Mordechai ("Modi") Haninovich          Osi Kaminer
514 West End Ave.
New York, New York 10024               New York, New York

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------x

DATABIT INC.,                                              Index No.

                                      Plaintiff,

        - against -                                        **VERIFIED COMPLAINT**

MORDECHAI HANINOVICH, OSI KAMINER,
JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3,

                                      Defendants.

-------------------------------------------------------------------------x

        Plaintiff, DATABIT, INC., by its attorneys, Paul Savad and Associates,

complaining of the defendants, alleges as follows:

        1.      At all times pertinent herein, plaintiff, DataBit Inc. ("DataBit"), was and is a

foreign corporation duly authorized to do business in the State of New York, with

offices at 350 Fifth Avenue, New York, NY 10118.

        2.      Upon information and belief, at all times pertinent herein, Defendant

Mordechai (Modi) Haninovich ("Haninovich") was and is a resident of the County of

New York, State of New York.

        3.      At all times pertinent herein, Defendant Osi Kaminer ("Kaminer"), was and

is a resident of the County of New York, State of New York.

        4.      Defendants John Doe, numbers 1, 2 and 3, are intended to be those

entities and/or individuals, currently unknown to plaintiff, with whom Haninovich

intends to provide to DataBit's customers those computer services now provided by

DataBit.

1

5.    DataBit is a Value Added Reseller (VAR) of computer systems, equipment and services to medium and large sized businesses.

6.    In or about March of 2006, Shlomie Morgenstern ("Morgenstern") purchased DataBit, which was formerly a wholly owned subsidiary of Data Systems & Software, Inc. ("Data Systems"), which was a publicly traded company founded by Morgenstern's father, who served as its president and CEO.

7.    Morgenstern is the president and sole shareholder of DataBit.

8.    Sometime in 1992, Haninovich was hired by DataBit as an account representative handling sales in the continental United States.

9.    Haninovich did not bring any clients into DataBit when he was hired, and began by servicing previously-existing accounts of DataBit while working to develop new accounts for DataBit.

10.    For reasons unknown to anyone at DataBit today, Haninovich has been carried on the books of DataBit as a 1099 independent contractor since he was first hired.  Haninovich is the only one in the company classified as a 1099 contractor.

11.    Upon information and belief, Haninovich's status as a 1099 contractor was based on his U.S. immigration status as an Israeli citizen without a green card.

12.    DataBit paid for an attorney for many years to help Haninovich obtain a green card and/or citizenship.

13.    At all times pertinent, Haninovich was acting as an agent of and on behalf of DataBit pursuant to an oral agreement, which was followed for many years, with DataBit paying all of Haninovich's business expenses, plus base compensation,

commissions, medical benefits, car and cell phone costs, and an expense account, in return for which Haninovich developed and serviced customers of DataBit.

14.    In or about the end of 1994 or the beginning of 1995, Haninovich brought Montefiore Medical Center to DataBit, which contracted with Montefiore to provide computer consultation services, computer equipment and technical support.

15.    In order to develop and service Montefiore's account, DataBit has at all times provided all of the necessary capital, technical support, ordering services, shipping services, accounting services, legal services, paid all expenses, and eventually provided a full-time employee dedicated solely to the Montefiore account under Haninovich's direction.

16.    DataBit has provided computer services for Montefiore continuously for 13 years, initially under written contract, and for many years thereafter and to date pursuant to a continuing agreement whereby DataBit has provided Montefiore with most of its computer consulting, purchasing, installation and maintenance needs, as and when requested by Montefiore, and has paid Haninovich to service the account and to be on-site at an office in Montefiore multiple days per week to oversee the continuous operation of a system that has grown to over 5,000 computer stations.

17.    In 2007, Montefiore's account constituted 60% of DataBit's revenues.

18.    Although neither DataBit nor Montefiore was obliged to continue this business relationship for any stated period of time, it has continued uninterrupted for 13 years without competition from any other provider, and without any indication that the arrangement would change, and with the historical understanding that DataBit's services to Montefiore could not be abruptly terminated without damage to

3

Montefiore's operations and without breaching an implied covenant of good faith and fair dealing.

19.   Upon information and belief, a transition period of six months is required to transfer responsibilities to service this account to another provider without disruption of Montefiore's and DataBit's operations, which expectation was relied upon by both parties.

20.   On or about December 27, 2008, DataBit's CFO sent an email to Haninovich explaining that DataBit's accountants were questioning Haninovich's status as a 1099 employee, and notified Haninovich that due to stricter IRS requirements, he could no longer be considered a self-employed 1099 contractor, and was requested to sign the necessary employee forms.

21.   Haninovich responded that his 1099 status was not his option and that he was forced into it.  Nonetheless, he did not sign the employee forms.

22.   On January 25, 2008, Haninovich resigned from DataBit without notice, effective immediately, knowing that DataBit's president, Shlomie Morgenstern, would be out of the country until January 30, 2008.

23.   Upon information and belief, for a period of time prior to resigning, Haninovich was making arrangements to service the Montefiore account with another entity and/or individuals who provide services similar to those provided by DataBit, and obtained legal services to further these arrangements.

24.   Prior to Haninovich's resignation, he failed to properly service the Montefiore account, leading to a written complaint by Montefiore to DataBit on January 29, 2008, complaining that outstanding orders had not been filled for weeks.

25.    On January 28, 2008, after Montefiore learned from Haninovich that he was no longer working for DataBit, Montefiore sent an email to Kaminer, a DataBit employee assigned as Haninovich's full-time assistant for the Montefiore account, and demanded that DataBit's president, Shlomie Morgenstern, contact them that very day to explain how DataBit intended to meet Montefiore's needs without a break in computer supplies and services.  Neither Haninovich nor Kaminer forwarded Montefiore's email to Shlomie Morgenstern for 24 hours, when they knew that Morgenstern would have already boarded a 12-hour flight from Israel to New York.

26.    On January 29, 2008, Montefiore sent an angry email to Shlomie Morgenstern for not responding to Montefiore's urgent message the previous day.

27.    Kaminer resigned her position with DataBit on February 1, 2008. Upon information and belief, she conspired with Haninovich to sabotage DataBit's relationship with Montefiore, and to divert Montefiore's business to the defendants for the benefit of the defendants.

28.    On the night of January 29, 2008, Morgenstern arrived back in the United States and met the next morning with lawyers to commence legal action to prevent Haninovich from misappropriating DataBit's trade secrets and proprietary information, taking unfair advantage of the knowledge he had acquired at DataBit's expense while working for DataBit, which knowledge is essential to service the Montefiore account without interruption, and which knowledge could not be timely obtained by a competitor without fraud or misappropriation of DataBit's proprietary trade secrets.

29.    The proprietary trade secrets that Haninovich and Kaminer threaten to misappropriate include DataBit's suppliers and costs, DataBit's profit margin, and extensive exclusive knowledge of all of Montefiore's computer needs, including the status of 5,000 computer stations and systems, what specific equipment requires upgrade or replacement, and well-developed relationships with the key personnel at Montefiore required to timely accomplish all purchases and services required by Montefiore.

30.    Haninovich did not return his computer to DataBit until February 1, 2008, after demanded by DataBit's attorneys, and, upon information and belief, has retained copies of account information needed to continue to service Montefiore's account.

31.    DataBit has retained Montefiore as a client for 13 years by carefully guarding its trade secrets, which are unknown to its competitors and unknown by Montefiore and/or protected by Montefiore in its own best interests.

32.    If the defendants are not restrained from misappropriating this proprietary information, DataBit will suffer millions of dollars of losses, some of which can be calculated based on past performance and some of which are incapable of calculation, since it is impossible to know what business DataBit might have acquired by the continued use of Montefiore as a sales tool to attract new accounts, and since it will be impossible to know how long Montefiore would have continued it's long-term virtually exclusive use of DataBit for its computer services in the absence of the wrongful acts of Haninovich, Kaminer and the other defendants.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST HANINOVICH & KAMINER
### (Breach of Fiduciary Duty/Loyalty)

33.    While acting as agent for DataBit, Haninovich and Kaminer had a fiduciary duty and a duty of loyalty to DataBit not to misappropirate confidential and proprietary information for their own benefit against the interests of DataBit.

34.    Haninovich's and Kaminer's conduct in taking advantage of their knowledge of DataBit's confidential trade secrets, including DataBit's profit margin, the clients' specific needs and timetable, as well as their unique relationship with DataBit's clients developed at DataBit's expense, and in positioning themselves to compete with DataBit while still working for DataBit, all constitute a breach of their fiduciary duty and breach of their duty of loyalty to DataBit.

35.    By reason of the foregoing, the plaintiff will sustain damages of 10 million dollars.


## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### (Unfair Competition & Misappropriation of Proprietary Trade Secrets)

36.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 through 34 with the same force and effect as if fully set forth herein at length.

37.    The defendants are engaging in unfair competition in that they have wrongfully and knowingly misappropriated and are making use of proprietary information, relationships and client good will, acquired while Haninovich and Kaminer were working for DataBit as its agents and on its behalf.

38. By reason of the foregoing, the plaintiff will sustain damages of 10 million dollars.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
(Tortious Interference with Contract and Prospective Economic Advantage)

39. Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 through 37 with the same force and effect as if fully set forth herein at length.

40. The defendants have knowingly and intentionally conspired together to interfere with the agreement and/or prospective economic advantage enjoyed by DataBit with Montefiore for over a decade.

41. The defendants know that there is an existing contractual arrangement between DataBit and Montfiore and/or that DataBit has the prospective economic advantage of continuing to provide computer services to Montefiore.

42. In the absence of the defendants' wrongful conduct, Montefiore would have continued its business relationship with DataBit for an indefinite time, as evidenced by the historical uninterrupted ever-increasing business relationship.

43. By reason of the foregoing, the plaintiff will sustain damages of 10 million dollars.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### (Accounting)

44.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 through 42 with the same force and effect as if fully set forth herein at length.

45.    By reason of the foregoing, plaintiff is entitled to an accounting of all expenses and revenue from clients of DataBit for whom the defendants or any of them may provide the same services provided by DataBit.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### (Preliminary & Permanent Injunction)

46.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 through 44 with the same force and effect as if fully set forth herein at length.

47.    The damage that will be caused to DataBit if the defendants proceed to solicit Montefiore's business based on DataBit's proprietary trade secrets is irreparable, in that it arises from a loss of good will and may result in unknown loss of prospective new clients and loss of an unknown number of years of continued business from Montefiore.

48.    By reason of the foregoing, plaintiff is entitled to a preliminary and permanent injunction enjoining the defendants from providing to Montefiore any of the computer services provided by DataBit to Montefiore in 2007.

9

WHEREFORE, plaintiff demands judgment against the defendants as follows:

   A.  On the First Cause Of Action against Haninovich and Kaminer, damages in the sum of 10 millions dollars;

   B.  On the Second Cause Of Action against all defendants, damages in the sum of 10 million dollars;

   C.  On the Third Cause of Action against all defendants, damages in the sum of ten million dollars;

   D.  On the Fourth Cause of Action against all defendants, an accounting of all expenses and revenues from clients of DataBase;

   E.  On the Fifth Cause of Action against all defendants, a preliminary and permanent injunction enjoining the defendants from providing to Montefiore any of the computer services provided by DataBit to Montefiore in 2007.

   F.  Interest on all damages, together with the costs and disbursements of this action and such further relief as the Court deems just and proper.

Dated:  Nanuet, New York
         February 3, 2008

PAUL SAVAD
PAUL SAVAD & ASSOCIATES
Attorneys for Plaintiff
55 Old Turnpike Rd. Ste. 209
Nanuet, New York 10954
845-624-3820

10

**VERIFICATION**

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF ROCKLAND )

SHLOMIE MORGENSTERN, duly affirms and says: I am President of

Plaintiff DATABIT INC., in the action herein. I have read the annexed Verified

Complaint and know the contents thereof, and the same are true to my

knowledge, except those matters therein which are stated to be alleged on

information and belief, and as to those matters I believe them to be true.

I affirm pursuant to my religious beliefs

_____
SHLOMIE MORGENSTERN

Affirmed before me this
3rd day of February, 2008

_____
Notary Public

SUSAN COOPER
Notary Public, State of New York
No. 4989636
Qualified in Rockland County
Commission Expires 12/16/0 9

**EXHIBIT "B"**

Modi Haninovich

514 West End Avenue

Suite 16C

New York, NY 10024

January 25, 2008

Dear Shlomie,

After working for your father and you for the last 14 years (or so) I have decided it's time for me to move on. I have most respect for your father personally and you and it's been a pleasure working with you over the years and I wish the company the best of luck

I am terminating my services to DataBit, Inc. effective immediately.

I will expect that all dollar amounts the company owes me for my services will be paid in full no later than 4/25/08 .

.

Very truly yours,

Modi Haninovich

EXHIBIT "C"



**DataBit**

Solutions for all Your I.T. Needs. Hardware. Software. Services.

NJ: 201-529-8050 | NY: 212-971-0282 | CA: 323-634-9357

About us | Catalog | Contact

## Sales

Databit account executives will help your business select, implement, and support the latest computer technology. Databit is a certified, value- added reseller of all major brands of computer hardware. More>>

## Implementation

Our highly trained team of technicians are authorized to implement and install all types of software and hardware solutions. More>>

## Support

Databit offers a wide variety of technical support services to fit your needs and budget including 24x7 Service contracts. More>>

## Wireless Technologies

DataBit is partnering with Single Digits™ to deliver Business Class Hotspot Services. As your strategic business ally, we are positioned to serve as your single point of contact delivering wireless and/or wired Internet services throughout your property. More>>



**DataBit is the KEY to your Business Computing needs.**

**Databit Inc.** is a single source solution provider specializing in a comprehensive range of hardware and software, integration and implementation services. DataBit offers global end-to-end solutions to its customers, and provides optimal service and support.

About Us | Catalog | Contact | Sales | Impementation | Support | Wireless Technologies

Copyright © 2006, Databit, Inc. All rights reserved.





**Solutions for all Your I.T. Needs. Hardware. Software. Services.**

**NJ:** 201-529-8050 | **NY:** 212-971-0282 | **CA:** 323-634-9357

About us | Catalog | Contact





The KEY to your
Business Computing needs.







Databit is a privately held, value added reseller offering a comprehensive range of hardware and software integration, design implementation and maintenance. We sell and service personal computer-based computer hardware, software, data storage, client/server and networking solutions.

We are an authorized direct seller, value-added-reseller and service provider for equipment and software from companies such as

- Hewlett-Packard
- IBM
- Dell
- Apple
- NEC
- 3COM
- Cisco
- Microsoft
- Oracle
- Citrix
- Symantec
- Toshiba
- Palm
- Symbol

We offer our customers a full range of system integration including design implementation, hardware and software selection, and installation of local and wide area networks among many other services.

Over the years, DataBit has built a solid reputation for dependability and integrity by supplying our customers with professional service. Our company employs highly qualified professionals who work very closely with the customer, establishing a partnership, which is so critical in the ever fast moving technology world. DataBit has an impressive portfolio of clients in a number of key industries such as legal, insurance and health care.

DataBit is headquartered in Mahwah New Jersey and employs 25 sales people operating out of New York, New Jersey, and California.

About Us | Catalog | Contact | Sales | Impementation | Support | Wireless Technologies

Copyright © 2006, Databit, Inc. All rights reserved.



**DataBit**

Solutions for all Your I.T. Needs. **Hardware. Software. Services.**

NJ: 201-529-8050 | NY: 212-971-0282 | CA: 323-634-9357

About us | Catalog | Contact






The KEY to your
**Business Computing** needs.



Our experienced sales staff pride themselves in being able to offer all our customers the best price and availability possible.



- ■ Continuous sales training by all leading computer manufacturers to ensure 100% customer satisfaction.

- ■ Fully trained office staff for all sales, purchases, returns and shipping needs to service our customers.

- ■ Years of experience specializing in small companies to fortune 500 companies.























About Us | Catalog | Contact | Sales | Impementation | Support | Wireless Technologies

Copyright © 2006, Databit, Inc. All rights reserved.



**Solutions for all Your I.T. Needs. Hardware. Software. Services.**

**NJ:** 201-529-8050 | **NY:** 212-971-0282 | **CA:** 323-634-9357

About us | Catalog | Contact



**Implementation**



The KEY to your
**Business Computing** needs.









### NEW! DATABIT EXPANDS ITS IMPLEMENTATION:

To actively manage the evolution of your network, Databit can build customized enterprise solutions that are flexible, cost-sensitive and needs-driven. Databit can evaluate your technology objectives and leverage the appropriate cross-practice capabilities to define the right solution for your organization.

Empowering you to produce value in the face of changes, Databit offers expertise in multi-capability networking, VPN design and implementation, and network security services. Databit also offers unique provisioning and hosting plans for your Internet connectivity and shared, dedicated, or virtual private hosting needs.

Our Technicians are trained and authorized in all types of hardware installations

■ We have extensive knowledge in installing stand alone computers, networks, servers, gateways, bridges, routers, etc.

■ We have extensive knowledge in installing wireless environments.

■ We are reauthorized yearly on all hardware products to maintain the highest level of knowledge and perform any job fast and efficiently saving our customer's time and money.

Databit maintains strong business relationships with all the major manufacturers of computer hardware, software, networking, and storage equipment including:

- Apple
- Cisco
- Citrix
- Compaq
- Dell
- EMC
- Hewlett-Packard
- IBM
- Intel
- Micrsoft
- NEC
- Nortel
- Oracle
- Sun
- Symantec
- Symbol
- 3COM
- Toshiba

 See extensive list of brand names that we sell (PDF)

 See extensive list of products that we stock (PDF)

About Us | Catalog | Contact | Sales | Impementation | Support | Wireless Technologies

Copyright © 2006, Databit, Inc. All rights reserved.

Databit Inc - support



Solutions for all Your I.T. Needs. Hardware. Software. Services.

**NJ:** 201-529-8050 | **NY:** 212-971-0282 | **CA:** 323-634-9357

About us | Catalog | Contact

  



The KEY to your
Business Computing needs.



Our technicians are authorized to repair all computer hardware and software related problems.

■ Our technicians are certified and authorized to repair all computers and printers in or out of warranty from all the major manufacturers such as Compaq, Hewlett Packard, IBM, etc.



■ Our technicians have been cited every year from major manufacturers for excellent work for repairs done at customer locations or at our state of the art lab.

■ Our technicians work closely with our salesman to insure that all customers who have any need for repair work will get it done fast and efficiently.



■ Experienced technicians specializing in all types of networks from small networks to large area networks

■ Extensive experience in installing wireless networks for any office environment.



■ Our technicians work together with our sales team to plan all phases of networks from sales to implementation to ensure 100% compatibility.

About Us | Catalog | Contact | Sales | Impementation | Support | Wireless Technologies

Copyright © 2006, Databit, Inc. All rights reserved.

EXHIBIT "D"

# COMPUTER HARDWARE SALES

*Products and Services*

On March 10, 2006, we sold our Databit computer hardware sales subsidiary. In the past, Databit provided all the revenue in our computer hardware segment. As a result of the sale, we will no longer have activity in our computer hardware segment after the first quarter of 2006. Through the date of its sale, Databit was engaged in the sale and service of PC-based computer hardware, software, data storage, client/server and networking solutions to large and midsize customers, operating as a value-added-reseller and/or an authorized service provider for equipment and software from such well-known industry leaders as HP/Compaq, IBM, Microsoft, Oracle, 3Com, NEC, Acer, Apple and Dell. Through the operations of the segment, we offered our customers a full range of systems integration services, including design, implementation, hardware and software selection, and implementation of local and wide area networks, as well as maintenance and service to customers under separate priced and negotiated extended service agreements.

*Customers and Markets*

Computer hardware segment sales included sales to two major customers, Montefiore Medical Center, a major New York medical center, which accounted for approximately 28%, 40% and 33% of segment sales and 19%, 34%, and 27% of consolidated sales in 2003, 2004 and 2005, respectively, and 67% and 54% of the segment's receivables and 37% and 34% of consolidated receivables, at the end of 2004 and 2005, respectively, and a large law firm which accounted for approximately 5%, 5% and 22% of segment sales and 3%, 4%, and 18% of consolidated sales in 2003, 2004 and 2005, respectively, and 2% and 6% of the segment's receivables and 1% and 4% of consolidated receivables, at the end of 2004 and 2005. No other customer accounted for more than 10% of segment sales. Most of our sales are made in the New York City Metropolitan area, with sales in this area accounting for 71%, 75% and 70% of segment revenues in 2003, 2004 and 2005, respectively.

DATA SYSTEMS & SOFTWARE INC.

FORM 10K

12/31/05

# EXHIBIT "E"

**Susan Cooper**

| | |
|---|---|
| **From:** | Shlomie Morgenstern [shlomie@databitinc.com] |
| **Sent:** | Thursday, January 31, 2008 2:48 PM |
| **To:** | susan@savadlaw.com |
| **Subject:** | Fw: Montefiore Medcial Center account |

**Importance:**        High


```
----- Original Message -----
From: "Osi Kaminer" <osi@databitinc.com>
To: "Shlomie" <shlomie@databitinc.com>
Sent: Tuesday, January 29, 2008 9:56 AM
Subject: Fw: Montefiore Medcial Center account


> Sorry for the delay, I just sew this email.
>
>
> ----- Original Message -----
> From: "Michael Levy" <milevy@montefiore.org>
> To: <osi@databitinc.com>
> Cc: "Ageta Popovich" <APOPOVIC@montefiore.org>; "Barry Sternberg"
> <BSTERNBE@montefiore.org>; "Charlie Agins" <CAGINS@montefiore.org>;
> "Joseph Dichiara" <JDICHIAR@montefiore.org>
> Sent: Monday, January 28, 2008 10:04 AM
> Subject: Montefiore Medcial Center account
>
>
>> Osi,
>>
>> I was recently informed that Modi has left the employ of DataBit.
>>
>> You mentioned today that the Schlomi, the owner, is out of the country
>> at the  moment.  I need you to communicate this email to him today and
>> require an answer today.
>>
>> I need to know specifically how DataBit is planning on servicing our
>> account.
>>
>> Who will be performing all the functions Modi had been performing:
>>     Come to Fordham Plaza 2x weekly to go over open issues and status
>> of various projects and requests for quotes
>>     Visit Yonkers on an as needed basis work with key technical
>> personnel to go over projects and specifications
>>     Arrange for repairs when needed
>>     Ensure our requests for quotations are provided timely (1-2 days)
>>     Research various problems and determine course of action to
>> rectify.
>>
>> Our main concern is to ensure we have an uninterruptible supply of PC's
>> and related supplies to all the associates of MMC  and expect DataBit to
>> do whatever is necessary to make it happen.
>>
>> I may be reached a t 718-405-4111
>>
>>
>>
>> Michael Levy CPM
>> Manager of Acquisitions
>>
>> Michael Levy  CPM., Manager of Acquisitions
>> Montefiore Medical Center
```

```
>> 1 Fordham Plaza 6th Fl.
>> Bronx, NY. 10458
>> (718) 405-4111
>> (718) 329-0360 FAX
>> milevy@montefiore.org
>>
>>
>
```

EXHIBIT "F"

## Employee Non- Compete Agreement

For good consideration and as an inducement for DataBit to employ_____, the undersigned Employee hereby agrees not to directly or indirectly compete with the business of the Company and its successors and assigns during the period of employment and for a period of six months following termination of employment and notwithstanding the cause or reason for termination.

The term "not compete" as used herein shall mean that the Employee shall not own, manage, operate, consult or be employed in a business substantially similar to, or competitive with, the present business of the company or such other business activity in which the Company may substantially engage during the term of employment.

The Employee acknowledges that the Company shall or may in reliance of this agreement provide Employee access to trade secrets, customers and other confidential data and good will.  Employee agrees to retain said information as confidential and not to use said information on his or her own behalf or disclose same to any third party.

This non-compete agreement shall extend only for a radius of one hundred miles from the present location of the Company and shall be in full force and effect for six months, commencing with the date of employment termination.

This agreement shall be binding upon and inure to benefit of the parties, their successors, assigns, and personal representatives.

Signed this _____ day of _____ 20__.

DataBit Inc._____

_____
Employee

# EXHIBIT "G"

# DATABIT, INC.

## CORPORATE EMPLOYEE POLICY MANUAL

### ISSUE DATE: MARCH 10, 2006



*DataBit, Inc.*

## Table of Contents

Policy

| | Effective Date: | Page: |
|---|---|---|
| Introduction | | |
| 0-10 Title Page | March 10, 2006 | |
| 0-20 Employee Welcome Message | March 10, 2006 | |
| 0-30 Introductory Statement | March 10, 2006 | |
| 0-40 Employee Acknowledgement Form | March 10, 2006 | |
| | | |
| Employment | | |
| 1-01 Nature of Employment | March 10, 2006 | |
| 1-02 Employee Relations | March 10, 2006 | 1 |
| 1-03 Equal Employment Opportunity | March 10, 2006 | 1 |
| 1-04 Business Ethics and Conduct | March 10, 2006 | 2 |
| 1-05 Immigration Law Compliance | March 10, 2006 | 2 |
| 1-06 Conflicts of Interest | March 10, 2006 | 3 |
| 1-07 Employment Termination | March 10, 2006 | 3 |
| 1-08 Outside Employment | March 10, 2006 | 4 |
| 1-09 Non-Disclosure | March 10, 2006 | 4 |
| 1-10 Disability Accommodation | March 10, 2006 | 5 |
| | | 5 |
| Employment Status & Records | | |
| 2-01 Employment Categories | March 10, 2006 | |
| 2-02 Access to Personnel Files | March 10, 2006 | 7 |
| 2-03 Personnel Data Changes | March 10, 2006 | 7 |
| 2-04 Introductory Period | March 10, 2006 | 8 |
| 2-05 Employment Applications | March 10, 2006 | 8 |
| 2-06 Performance Evaluation | March 10, 2006 | 9 |
| | | 9 |
| Employment Benefit Programs | | |
| 3-01 Employee Benefits | March 10, 2006 | |
| 3-02 Vacation Benefits | March 10, 2006 | 10 |
| 3-03 Child Care Benefits | March 10, 2006 | 10 |
| 3-04 Sick Leave Benefits | March 10, 2006 | 11 |
| 3-05 Personal Time | March 10, 2006 | 12 |
| 3-06 Holidays | March 10, 2006 | 12 |
| 3-07 Workers' Compensation Insurance | March 10, 2006 | 13 |
| 3-08 Benefits Continuation (COBRA) | March 10, 2006 | 14 |
| 3-09 Health Insurance | March 10, 2006 | 14 |
| 3-10 Life Insurance | March 10, 2006 | 15 |
| 3-11 Long-Term Disability | March 10, 2006 | 15 |
| 3-12 401(k) Savings Plan | March 10, 2006 | 16 |
| 3-13 Jury Duty | March 10, 2006 | 16 |
| 3-14 Witness Duty | March 10, 2006 | 17 |
| | | 17 |
| Timekeeping/ Payroll | | |
| 4-01 Timekeeping | | |
| 4-02 Paydays | March 10, 2006 | 18 |
| 4-03 Administrative Pay Corrections | March 10, 2006 | 18 |
| 4-05 Pay Setoffs | March 10, 2006 | 18 |
| | March 10, 2006 | 19 |
| Work Conditions & Hours | | |
| 5-01 Work Schedules | March 10, 2006 | 20 |

*DataBit, Inc.*

5-02 Use of Phone and Mail Systems
5-03 Computer and E-mail Usage                    March 10, 2006
5-04 Smoking                                       March 10, 2006              20
5-05 Meal Periods                                  March 10, 2006              20
5-06 Business Travel Expenses                      March 10, 2006              21
5-07 Commuting Expenses                            March 10, 2006              21
5-08 Meal Expenses                                 March 10, 2006              21
5-09 Cellular Phone Expense                        March 10, 2006              22
5-10 Workplace Monitoring                          March 10, 2006              23
5-11 Telecommuting                                 March 10, 2006              23
5-12 Workplace Violence Prevention                 March 10, 2006              23
                                                   March 10, 2006              24
                                                                               25

Leaves of Absence
6-01 Medical Leave
6-02 Family Leave                                  March 10, 2006
6-03 Pregnancy-Related Absences                    March 10, 2006              26
6-04 Bereavement Leave                             March 10, 2006              27
6-05 Military Leave                                March 10, 2006              28
                                                   March 10, 2006              28
                                                                               29

Employee Conduct & Disciplinary Action
7-01 Employee Conduct and Work Rules
7-02 Sexual and Other Unlawful Harassment          March 10, 2006
7-03 Attendance and Punctuality                    March 10, 2006              30
7-04 Return of Property                            March 10, 2006              30
7-05 Security Inspections                          March 10, 2006              31
7-06 Progressive Discipline                        March 10, 2006              31
                                                   March 10, 2006              31
                                                                               32

Miscellaneous
8-01 Suggestion Program
                                                   March 10, 2006
                                                                               33

*DataBit, Inc.*

## 1-09 Non-Disclosure

Effective Date: 03/10/2006

The protection of confidential business information and trade secrets is vital to the interests and the success of DataBit. Such confidential information includes, but is not limited to, the following examples:

* Computer processes
* Computer programs and codes
* Customer lists
* Financial information
* Marketing strategies
* New materials research
* Pending projects and proposals
* Proprietary production processes
* Research and development strategies
* Technological data
* Technological prototypes

All employees may be required to sign a non-disclosure agreement as a condition of employment. Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

## 1-10 Disability Accommodation

Effective Date: 03/10/2006

DataBit is committed to complying fully with the Americans with Disabilities Act (ADA) and ensuring equal opportunity in employment for qualified persons with disabilities. All employment practices and activities are conducted on a non-discriminatory basis.

Hiring procedures have been reviewed and provide persons with disabilities meaningful employment opportunities. Pre-employment inquiries are made only regarding an applicant's ability to perform the duties of the position.

Reasonable accommodation is available to all disabled employees, where their disability affects the performance of job functions. All employment decisions are based on the merits of the situation in accordance with defined criteria, not the disability of the individual.

Qualified individuals with disabilities are entitled to equal pay and other forms of compensation (or changes in compensation) as well as in job assignments, classifications, organizational structures, position descriptions, lines of progression, and seniority lists. Leave of all types will be available to all employees

5

EXHIBIT "H"

**Susan Cooper**

| | |
|---|---|
| **From:** | Neil Fogel [nfogel@databitinc.com] |
| **Sent:** | Monday, December 31, 2007 9:42 AM |
| **To:** | modih@att.net |
| **Subject:** | Re: Very important |


The only thing I can tell you is that as an employee you will be saving half of your
social security expense, will have employer paid coverage for disability insurance &
workmens compensation.

----- Original Message -----
From: <modih@att.net>
To: "Neil Fogel" <nfogel@databitinc.com>; "Modi Haninovich"
<modih@worldnet.att.net>
Sent: Friday, December 28, 2007 2:57 PM
Subject: Re: Very important


> To reminf you it wasnt my optin.  I was forced to it.
> You knew it before yesterday?
> Sent via BlackBerry by AT&T

> -----Original Message-----
> From: "Neil Fogel" <nfogel@databitinc.com>
>
> Date: Fri, 28 Dec 2007 10:32:22
> To:"Modi Haninovich" <modih@worldnet.att.net>
> Subject: Re: Very important
>
>
> our accountants are questioning your status & relationship to the
> company
> ----- Original Message -----
> From: Modi
>  Haninovich <mailto:modih@worldnet.att.net>
> To: 'Neil Fogel' <mailto:nfogel@databitinc.com>
> Sent: Thursday, December 27, 2007 9:07 PM
> Subject: RE: Very important
>
>
> What are the new regulations? And stricter enforcements?
>
>
>
> From: Neil Fogel [mailto:nfogel@databitinc.com]
> Sent: Thursday, December 27, 2007 5:14 PM
> To: Modi Haninovich
> Subject: Very important
>
>
> Modi,
>
> Due to stricter enforcement of IRS regulations, as of 2008 you will no
> longer be able to be considered as a self-employed, 1099 contractor.
>
> You will be treated as a regular employee with all its benefits and
> responsibilities.
>
> Neil

1

**EXHIBIT "I"**

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
Employment Eligibility Verification

Please read instructions carefully before completing this form. The instructions must be available during completion of
this form. ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. Employers
CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a
future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

| Address (Street Name and Number) | | Apt. # | Date of Birth (month/day/year) |
|---|---|---|---|
| City | State | Zip Code | Social Security # |

| I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form. | I attest, under penalty of perjury, that I am (check one of the following):<br>☐ A citizen or national of the United States<br>☐ A Lawful Permanent Resident (Alien # A<br>☐ An alien authorized to work until ___/___/___<br>(Alien # or Admission # |
|---|---|
| Employee's Signature | Date (month/day/year) |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person
other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that
to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR
examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of
the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: | | | | |
| Issuing authority: | | | | |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | | | |
| Document #: | | ___/___/___ | | |
| Expiration Date (if any): ___/___/___ | | | ___/___/___ | |

**CERTIFICATION -** I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named
employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the
employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee
is eligible to work in the United States. (State employment agencies may omit the date the employee began
employment).

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment
eligibility.

Document Title: _____ Document #: _____ Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee
presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

Form I-9 (Rev. 11-21-91) N

# LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| **Documents that Establish Both Identity and Employment Eligibility** | **OR** | **Documents that Establish Identity** | **AND** | **Documents that Establish Employment Eligibility** |

**LIST A — Documents that Establish Both Identity and Employment Eligibility**

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship (INS Form N-560 or N-561)

3. Certificate of Naturalization (INS Form N-550 or N-570)

4. Unexpired foreign passport, with I-551 stamp or attached INS Form I-94 indicating unexpired employment authorization

5. Alien Registration Receipt Card with photograph (INS Form I-151 or I-551)

6. Unexpired Temporary Resident Card (INS Form I-688)

7. Unexpired Employment Authorization Card (INS Form I-688A)

8. Unexpired Reentry Permit (INS Form I-327)

9. Unexpired Refugee Travel Document (INS Form I-571)

10. Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B)

**LIST B — Documents that Establish Identity**

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

2. ID card issued by federal, state, or local government agencies or entities provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor, or hospital record

12. Day-care or nursery school record

**LIST C — Documents that Establish Employment Eligibility**

1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment)

2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card (INS Form I-197)

6. ID Card for use of Resident Citizen in the United States (INS Form I-179)

7. Unexpired employment authorization document issued by the INS (other than those listed under List A)

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

## INSTRUCTIONS
PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1 - Employee.** All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

**Section 2 - Employer.** For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers, or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. Employers must record: 1) document title; 2) issuing authority; 3) document number, 4) expiration date, if any; and 5) the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. **However, employers are still responsible for completing the I-9.**

**Section 3 - Updating and Reverification.** Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1. Employers **CANNOT** specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/ reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block C and:
  - examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),
  - record the document title, document number and expiration date (if any) in Block C, and
  - complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced provided both sides are copied. The Instructions must be available to all persons completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the INS Handbook for Employers, (Form M-274). You may obtain the handbook at your local INS office.**

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 U.S.C. 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Naturalization Service, the Department of Labor, and the Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes; 2) completing the form, 5 minutes; and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to both the Immigration and Naturalization Service, 425 I Street, N.W., Room 5304, Washington, D. C. 20536; and the Office of Management and Budget, Paperwork Reduction Project, OMB No. 1115-0136, Washington, D.C. 20503.

Form I-9 (Rev. 11-21-91) N

**EMPLOYERS MUST RETAIN COMPLETED I-9**
**PLEASE DO NOT MAIL COMPLETED I-9 TO INS**

# Form W-4 (2007)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2007 expires February 16, 2008. See Pub. 505, Tax Withholding and Estimated Tax.

**Note.** You cannot claim exemption from withholding if (a) your income exceeds $850 and includes more than $300 of unearned income (for example, interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the Personal Allowances Worksheet below. The worksheets on page 2 adjust your withholding allowances based on

itemized deductions, certain credits, adjustments to income, or two-earner/multiple job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the Personal Allowances Worksheet below. See Pub. 919, How Do I Adjust My Tax Withholding, for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax

for Individuals. Otherwise, you may owe additional tax. If you have pension or annuity income, see Pub. 919 to find out if you should adjust your withholding on Form W-4 or W-4P.

**Two earners/Multiple jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2007. See Pub. 919, especially if your earnings exceed $130,000 (Single) or $180,000 (Married).

---

## Personal Allowances Worksheet (Keep for your records.)

| | | |
|---|---|---|
| A | Enter "1" for yourself if no one else can claim you as a dependent | A ___ |
| B | Enter "1" if: { • You are single and have only one job; or<br>• You are married, have only one job, and your spouse does not work; or<br>• Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less. } | B ___ |
| C | Enter "1" for your spouse. But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) | C ___ |
| D | Enter number of dependents (other than your spouse or yourself) you will claim on your tax return | D ___ |
| E | Enter "1" if you will file as head of household on your tax return (see conditions under Head of household above) | E ___ |
| F | Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit<br>(Note. Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.) | F ___ |
| G | Child Tax Credit (including additional child tax credit). See Pub 972, Child Tax Credit, for more information.<br>• If your total income will be less than $57,000 ($85,000 if married), enter "2" for each eligible child.<br>• If your total income will be between $57,000 and $84,000 ($85,000 and $119,000 if married), enter "1" for each eligible child plus "1" additional if you have 4 or more eligible children. | G ___ |
| H | Add lines A through G and enter total here. (Note. This may be different from the number of exemptions you claim on your tax return.) ▶ | H ___ |

| | | |
|---|---|---|
| For accuracy, complete all worksheets that apply. | • If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.<br>• If you have more than one job or are married and you and your spouse both work and the combined earnings from all jobs exceed $40,000 ($25,000 if married) see the Two-Earners/Multiple Jobs Worksheet on page 2 to avoid having too little tax withheld.<br>• If neither of the above situations applies, **stop here** and enter the number from line H on line 5 of Form W-4 below. | |

- - - - - - - - - - Cut here and give Form W-4 to your employer. Keep the top part for your records. - - - - - - - - - -

---

| Form **W-4**<br>Department of the Treasury<br>Internal Revenue Service | **Employee's Withholding Allowance Certificate**<br>▶ Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS. | OMB No. 1545-0074<br>**2007** |
|---|---|---|

| 1 | Type or print your first name and middle initial. | Last name | | 2 Your social security number |
|---|---|---|---|---|

| Home address (number and street or rural route) | 3 ☐ Single ☐ Married ☐ Married, but withhold at higher Single rate.<br>Note. If married, but legally separated, or spouse is a nonresident alien, check the "Single" box. |
|---|---|
| City or town, state, and ZIP code | 4 If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a replacement card. ▶ ☐ |

| 5 | Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2) | 5 | |
|---|---|---|---|
| 6 | Additional amount, if any, you want withheld from each paycheck | 6 | $ |
| 7 | I claim exemption from withholding for 2007, and I certify that I meet **both** of the following conditions for exemption.<br>• Last year I had a right to a refund of **all** federal income tax withheld because I had **no** tax liability **and**<br>• This year I expect a refund of **all** federal income tax withheld because I expect to have **no** tax liability.<br>If you meet both conditions, write "Exempt" here ▶ | 7 | |

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct, and complete.

**Employee's signature**
(Form is not valid
unless you sign it.) ▶ _____    Date ▶ _____

| 8 | Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | 9 Office code (optional) | 10 Employer identification number (EIN) |
|---|---|---|---|

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 10220Q    Form **W-4** (2007)

DataBit Inc.

# DIRECT DEPOSIT REQUEST

To implement direct deposit, complete this form and return to:

DataBit Inc.
Attention: Alice Knoll
200 Route 17
Mahwah, NJ 07430.

Name on Account: _____

Account Number: _____

Bank Name: _____

Bank Address: _____

Bank ABA: _____

Bank Phone Number: _____

(Check One)    ☐ Checking      ☐ Savings

# Data Bit, Inc.

## Family Fact Sheet

**Employee Name:** _____

**Address:** _____

_____

_____

_____

**Phone:** _____

**Date of Birth:** _____

**Spouse's Name:** _____

**Date of Birth:** _____

**Date of Marriage:** _____

**Children:**

| Name | Sex | Date of Birth |
|------|-----|---------------|
|      |     |               |
|      |     |               |
|      |     |               |
|      |     |               |
|      |     |               |

**Emergency Contact:**

Name _____

Relationship _____

Day Phone _____

Evening Phone _____

**EXHIBIT "J"**

**Susan Cooper**

From:           Shlomie Morgenstern [shlomie@databitinc.com]
Sent:           Friday, February 01, 2008 9:28 AM
To:             susan@savadlaw.com
Subject:        Fw: PENDING QUOTES - PLEASE REVIEW AND ADVISE


----- Original Message -----
From: "Michael Levy" <MILEVY@montefiore.org>
To: <nfogel@databitinc.com>
Cc: <osi@databitinc.com>; <shlomie@databitinc.com>; "Joseph Dichiara"
<JDICHIAR@montefiore.org>
Sent: Tuesday, January 29, 2008 10:01 AM
Subject: Fwd: PENDING QUOTES - PLEASE REVIEW AND ADVISE


> Neil,
>
> Below are two of the email chains we had recently.  One is form Ellis
> Polin and the other from Josephine Russo.
>
> I am sorry to say, MMC is extremely disappointed and frustrated by the
> way our account has been serviced lately.  Waiting weeks for quotes is
> unacceptable and will not be tolerated.  If we cannot get quotes for all
> open requests by tomorrow, we will place our orders with alternate
> vendors.
>
> The fact that your representative, Modi, has left your employ and
> nobody from DataBit contacted us to inform us or to explain specifically
> how the account will be serviced in the future is unconscionable.
>
> Yesterday, I conveyed our dismay to Osi and asked that an email I sent
> her be forwarded on to Schlomie with an expectation of some answers.  I
> have not received any communication from Schlomie nor any other DATABIT
> senior management.
>
> It would appear that in the eye of DataBit, the MMC account is not
> important enough for either reasonable service or common business
> courtesy in communicating significant changes.
>
> We fully expect an immediate turnaround (TODAY) of all these outshining
> issues.
>
>
>
> Michael Levy CPM
> Manager of Acquisitions
>
>
>
>
>
>>>> Ellis Polin 01/29/08 9:27 AM >>>
>
>
>>>> Ellis Polin 01/29/08 8:09 AM >>>
> Modi:  The following are on my list and this needs to be addressed.
> M8ONC01S00 1107245 8742 HHU LENOVO THINK PAD T60
> M7AIK13S00 11020328 7764CTO THINKPAD X61 TABLET SERIES
> M8PDA09S00 11020886 MACBOOK 13" BLACK 2.2 GHZ
> M8PDD56S00 11020961  LENOVO THINKPAD AND ERGOTRON STYLEVIEW
> W8MEC7S00 11020962 GY947US
> M8XXK80S00 11021396 2008 MAC PRO

1

```
>                                M9178LL/A APPLE CINEMA HD
> DISPLAY
> 11022549 INK CARTRIDGE - DELL
> M8LAB06SS00 11023830 P766A8 HP 17" LCD FLAT PANEL DISPLAY
>
>
> Ellis
>
> ***********************************************************************
>
>
>
>
>
>
> Josephine Russo
> Dept. of Acquisitions
> Office: (718) 405-4358
> Fax:    (718) 563-2614
> jrusso@montefiore.org
>
>>>> "Modi Haninovich" <modih@worldnet.att.net> 01/27/08 3:18 PM >>>
> Josephine,
>
> Thank for being so patient!
>
> I wanted to let you know that I forwarded the following requstions to
> Joe as
> requested. Please contact him and discuss.
>
>
> MMC Tracking number      MMC Req. number
> M7DDM21S00...............11014148
> M7DDJ25S00...............10974525
> M8DDA26S00...............11016608
> M8DDA28S00...............11016606
> M8DDA53S00...............11019714
> M8DDA27S00...............11017589
> M7HCK92S00...............11011217
> M7HCK98S00...............11011280
>
> The following 2 I will address with you on Tuesday -
>
>
> M8DDA72S00...............11022622
>
> The following I don't have -
>
> M8DDA52S00...............11021410
> M8MKE87S00...............11018568  (I know that Osi is preparing a
> quote
> for you.)
> W7OBZ42S00...............11009054
> W8OBZ03S00...............11021930
>
> -----Original Message-----
> From: Josephine Russo [mailto:JRUSSO@montefiore.org]
> Sent: Friday, January 25, 2008 11:01 AM
> To: osi@databitinc.com
> Cc: Barry Sternberg; Michael Levy; modih@worldnet.att.net
> Subject: Outstanding requisitions---In need os Sales Order
>
> Osi:  Please advise on the status of the following:
>
> M7DDM21S00...............11014148
> M7DDJ25S00...............10974525
> M8DDA25S00...............11016611
```

2

```
> M8DDA26S00................11016608
> M8DDA28S00................11016606
> M8DDA52S00................11021410
> M8DDA53S00................11019714
> M8DDA27S00................11017589
> M8DDA72S00................11022622
> M7HCK92S00................11011217
> M7HCK98S00................11011280
> M8MKE87S00................11018568
> W7OBZ42S00................11009054
> W8OBZ03S00................11021930
>
> Thanks, Josephine
>
> Josephine Russo
> Dept. of Acquisitions
> Office: (718) 405-4358
> Fax:    (718) 563-2614
> jrusso@montefiore.org
>
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

DATABIT INC.,

                               Plaintiff,

      - against -

MORDECHAI HANINOVICH, OSI KAMINER,
JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3,

                               Defendants.
-----------------------------------------------------------------------x

Case No. 08cv1229
(MGC)(AJP)

**AFFIDAVIT**

STATE OF NEW JERSEY )
                     )
COUNTY OF BERGEN   )

      Neil Fogel affirms the following under penalty of perjury:

      1.      I am employed by DataBit Inc. ("DataBit"), the plaintiff in this case, as the Chief Financial Officer and have been employed in this capacity since December 1997.

      2.      I reside in Monsey, New York.

      3.      I have been asked by DataBit to provide an affidavit concerning DataBit's account with Montefiore Medical Center ("Montefiore"), Mordechai ("Modi") Haninovich's relationship to that account and his compensation package.

      4.      As the Chief Financial Officer of DataBit, I have direct knowledge of what DataBit's prices and costs are and what its profit margin is on each account.

**Montefiore Account**

      5.      Montefiore is DataBit's largest client, generating $8 million in revenues in 2007, which accounts for approximately 60% of DataBit's revenues

last year.  If DataBit lost this account, the company would no longer be viable, and the company would have to cut back staff and facilities by approximately 60%.

6.      In order to service the Montefiore account, DataBit needs a minimum of $2.5 million in cash reserves to purchase the computer equipment and to supply technicians to Montefiore, which does not pay us for at least 90 and up to 120 days after it is invoiced.  Banks do not generally loan funds for this purpose.  Having known and worked with Modi for a decade, I believe that he does not have the resources to supply the capital outlay or support services (ordering, shipping, etc.) to service this account without partnering with another well-established, certified computer reseller.

7.      DataBit used their own employee technicians to service the Montefiore account, and also supplemented by paying for additional technicians supplied by a company called Smart Source.  Smart Source would bill DataBit, and DataBit would bill Montefiore at a rate that provided a profit margin for DataBit.  I have confirmed with Smart Source's accounts payable department that since October of 2007, when Modi advised Shlomie Morgenstern that Montefiore's purchase order for supplying these technicians had expired (see Morgenstern Affidavit), Smart Source has been billing Advanced Solutions & Supply LLC for performing the same type of work, apparently at Modi's request. This diverted DataBit's business to Advanced Solutions, and undoubtedly to Modi.

8.      According to New York State Department of State records (attached as Exhibit A), Advanced Solution's address for service of process is

Oded Levy, Kaia Investment Management, 767 Third Avenue, 6th Floor, New

York, New York, 10017. Oded Levy is a friend of Modi's. Modi requested that

we sell products to him from time to time. I have confirmed with an owner of

Smart Source, Joe Iovinelli, that Smart Source sent the bills for the work

performed to Advanced Solutions at 767 Third Avenue, the address of Modi's

friend, instead of to DataBit.

8.     I have also today confirmed with Larry Grippo of Corporate

Computer Solutions ("CCS"), that during the week of January 18, 2008, Modi

approached him and asked that he provide technicians for Montefiore's account.

he believed that Modi was representing DataBit. Grippo reported that Modi later

asked that he not tell DataBit about this. Mr. Grippo told me that he would not

play such games, and is cooperating to help unravel Modi's apparent deception.

CCS apparently provided technicians to Montefiore for two partial weeks in

January, including some of the same people who were previously provided by

Smart Source. When CCS innocently called to ask why DataBit had not yet

billed them, the diverting of business to Modi was revealed.


**Modi's Position at DataBit**

9.     For reasons unknown to me, Modi has been carried on DataBit's

books as a 1099 contractor since he first came to the company in 1992. There

are no other 1099 contractors working for Databit. All other account

representatives who do the same the job and receive the same compensation

are employees of DataBit.

10.     Since Modi came to the company in 1992, DataBit has paid all of

his expenses and has provided all of the back-up services and capital needed for Modi to develop and service accounts and to build the relationship that exists today between DataBit and Montefiore.  Until his abrupt resignation on January 25, 2008, DataBit also provided Modi with base compensation, commissions, a car allowance, a cell phone, medical benefits, and an expense account, which, in 2006, for example, totaled $314,169.  The figures for 2007 will be higher, but are not yet available.

11.     All of the account representatives working for DataBit, including Modi, receive the same commission rate, are paid for all of their business-related expenses and are provided with medical benefits.  Depending on the account representative's experience and performance, he/she will receive additional benefits.  All account representatives with longevity at DataBit, like Modi, receive a base amount, commissions, a cell phone, a car, and an expense account, in addition to medical benefits. DataBit pays for all of their expenses relating to their employment, and supplies all capital and support services.

12.     DataBit's accountants questioned Modi's status as a 1099 contractor in 2007.  Accordingly, on December 27, 2007, I advised Modi that he could no longer be carried on the books as a 1099 contractor, and would carried as an employee.  I requested that he sign the required employee forms.  He did not do so.

13.     I affirm this affidavit pursuant to my religious beliefs.

4

NEIL FOGEL

Affirmed before me on this
12th day of February, 2008

Notary Public

NOTARY PUBLIC
STATE OF NEW JERSEY
DAVID M. GRIB
MY COMMISSION EXPIRES 9 / 14 / 2011

# EXHIBIT "A"

# NYS Department of State

## Division of Corporations

## Entity Information

Selected Entity Name: ADVANCED SOLUTIONS & SUPPLY LLC

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | ADVANCED SOLUTIONS & SUPPLY LLC |
| **Initial DOS Filing Date:** | NOVEMBER 10, 2006 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O ODED LEVY
KAIA INVESTMENT MANAGEMENT
767 THIRD AVENUE, 6TH FLOOR
NEW YORK, NEW YORK, 10017

**Registered Agent**
NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------x

DATABIT INC.,                                                          Index No.

                                         Plaintiff,

        - against -
                                                              **AFFIDAVIT**

MORDECHAI HANINOVICH, OSI KAMINER,
JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3,


                                         Defendants.
--------------------------------------------------------------------x

STATE OF NEW JERSEY )
                    )
COUNTY OF BERGEN    )

        Gilbert Gehler affirms the following under penalty of perjury:

        1.      I am employed by DataBit Inc. ("DataBit"), the plaintiff in this case,

as an account representative and have been employed in this capacity since

1994.

        2.      I reside in Monsey, New York.

        3.      I have been asked by DataBit to provide an affidavit concerning my

recollection of DataBit's Montefiore Medical Center ("Montefiore") account and

Mordechai ("Modi") Haninovich's relationship to that account.

        4.      I became employed by DataBit approximately one year after Modi

Haninovich.  I worked in the same capacity as Modi, who was also an account

representative.  At that time, Montefiore was not a client of DataBit, and Modi

was servicing only the existing accounts that DataBit gave to him to service.

5.    During my first year with DataBit, Modi went to Israel for three weeks, and I was asked to supervise the accounts that he handled for DataBit while he was away.  There was no business from Montefiore at that time.

6.    At the end of 1994 or the beginning of 1995, I learned that Montefiore had become a client of DataBit, and was told by Modi that his neighbor was a doctor at Montefiore.  Through his neighbor, Modi was eventually introduced to Montefiore, which became one of DataBit's clients.  Throughout Modi's development of Montefiore as a client, he was paid by DataBit to find, develop and service accounts for DataBit.

7.    Modi's job as an account representative was identical to all other account representatives for DataBit, including myself.  Whenever Modi received a new benefit from DataBit, I would receive a similar benefit the following year, when I had achieved the same level of longevity that Modi had achieved the year prior.  The benefits that we received included a base amount, commission, a car allowance, a cell phone, an expense account and health insurance.

8.    I affirm this affidavit pursuant to my religious beliefs.

GILBERT GEHLER

Affirmed before me on this
/st day of February, 2008

Notary Public

10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x

DATABIT INC.,                                                Index No.

                                  Plaintiff,

      - against -

                                          **AFFIDAVIT**

MORDECHAI HANINOVICH, OSI KAMINER,
JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3,

                                  Defendants.
-----------------------------------------------------------------------x

STATE OF NEW JERSEY )
                      )
COUNTY OF BERGEN    )

      Rami Zilberschmidt affirms the following under penalty of perjury:

      1.      I am one of the original developers of DataBit Inc. ("DataBit"), the plaintiff in this action, and have been employed by DataBit as an account representative for approximately fifteen years.   I am responsible for the company's sales in Israel.

      2.      I reside in Fairlawn, New Jersey.

      3.      I have been asked by DataBit to submit this affidavit concerning my knowledge of Modi Haninovich's hiring by DataBit and of how Montefiore Medical Center became a client of DataBit, since I am the only one still at the company who was there when Modi was first hired.

      4.      In 1990, Dove Glickstein founded DataBit.  I joined the company in July of 1992 and introduced it to Data Systems and Software Inc., which

purchased DataBit as a subsidiary. Dove Glickstein was providing the administrative and technical services, and I was the sole sales representative. I was introduced to Modi, and then introduced him to Dove Glickstein, who hired him as a second sales representative, responsible for sales in the continental United States. DataBit was a publicly traded company until 2006, when it was purchased by Shlomie Morgenstern, whose father was the founder, CEO and president of DataBit's parent company, Data Systems and Software Inc.

5.    Modi brought no accounts with him to DataBit when he first began working there. DataBit gave him some of their existing accounts to service. He was expected to develop new accounts for DataBit. It was not until approximately one year later, in or around the end of 1994, beginning of 1995, that Montefiore became a client of DataBit, through defendant's efforts, all financed by DataBit.

6.    DataBit currently has approximately twenty employees with offices in New York, New Jersey and California. The account representatives, including Modi, are all compensated based upon their experience and performance, although they all receive the same commission. They receive a base amount, a commission, a cell phone, a car, an expense account and medical benefits. DataBit pays for all of their expenses relating to their employment. Although I am an account representative, I am compensated a little differently, because I helped found the company.

7.    I do not have a written contract with DataBit. I have always worked based upon the good working and honorable relationship that we have had for

approximately 15 years, as have all of our employees.  Most of DataBit's employees have been here for many years.  The turnover is very small.

8.    The defendant's responsibilities were identical to every other account representative working for DataBit, including myself.    He made cold calls to prospective clients and followed up on leads to find clients, and serviced the accounts developed.  All of his business expenses are paid by the company.

9.    I am aware that there is an issue about Modi being an independent contractor rather than an employee.  I have no personal knowledge of why his status is different, as his duties and remuneration are the same as all other account representatives.  He brings nothing different to DataBit than any other account representative.

10.    I affirm this affidavit pursuant to my religious beliefs.

_____
RAMI ZILBERSCHMIDT

Affirmed before me on this _1st_
day of February, 2008

_____
Notary Public

10